# IN THE SUPREME COURT OF IOWA

No. 21–1115

Submitted October 25, 2022—Filed November 10, 2022

**STATE OF IOWA,**

Appellant,

vs.

**FETHE FESHAYE BARAKI,**

Appellee.

Appeal from the Iowa District Court for Woodbury County, John C. Nelson, District Associate Judge.

The State seeks discretionary review of the trial court's ruling sustaining a motion to suppress the results of a chemical breath test. **REVERSED AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Thomas J. Miller, Attorney General, and Zachary Miller (argued), Assistant Attorney General, for appellant.

Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy (argued), Assistant Appellate Defender, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

Before a suspected drunk driver is asked to submit to a chemical breath test, Iowa law requires that they "shall be advised by a peace officer" of certain legal consequences. Iowa Code § 321J.8 (2021). In this case, a native speaker of Tigrinya, a language commonly spoken in Eritrea and parts of Ethiopia, contends that his breath test should be suppressed because no Tigrinya interpreter was available and the advisory was read to him in English. We conclude that Iowa law does not require the impracticable, and that the police officer discharged his duty by making all reasonable efforts to obtain a Tigrinya interpreter before reading the advisory to the defendant in English, a language that the defendant understood to some extent. Accordingly, we reverse the order of the district court granting the defendant's motion to suppress and remand for further proceedings.

### II. Background Facts and Proceedings.

Shortly before midnight on May 6, 2021, Sioux City Police Officer Michael Sitzman, while conducting routine patrol, pulled over a vehicle for a red-light violation and for moving unusually slowly.

The driver of the vehicle was the defendant Fethe Baraki. Baraki is from Eritrea; his primary language is Tigrinya.

After Officer Sitzman observed that Baraki had signs of impairment, Officer Colin Scherle was called to the scene. Officer Scherle belonged to the unit handling operating-while-intoxicated (OWI) investigations. Officer Scherle noticed that Baraki had "red watery bloodshot eyes along with the odor of alcohol

coming from his person." He also noticed that Baraki "had a pretty distinct language barrier." However, Baraki clearly understood many of Officer Scherle's questions and commands.

Officer Scherle requested that Baraki exit his car to conduct the standardized field sobriety testing.[1] Without further explanation, Baraki immediately released his seat belt and got out of the vehicle. Officer Scherle repeatedly asked Baraki if he had consumed alcohol or drugs throughout the entirety of the interaction, and Baraki repeatedly denied having done so. Officer Scherle had Baraki perform the horizontal gaze nystagmus test, which Baraki failed. Baraki complained of a leg injury and limped throughout the encounter, but he was unable to explain the particulars of his injury in English.

Baraki could answer in English where he worked, how old he was, where he came from, and where he was right now (Sioux City). At the same time, he did not seem to understand when Officer Scherle asked what "state" he was in.

Next, Officer Scherle held up the device used to conduct the preliminary breath test (PBT) and asked Baraki if he was "willing to do this test" for him. Baraki agreed. Taking the test took several attempts but Baraki understood when Officer Scherle corrected him. After the PBT came back over the legal limit, Baraki was arrested and transported to the Woodbury County Law Enforcement Center.

---

[1]At this point, Officer Scherle's bodycam reveals that there was a passenger in the front seat.

Upon arrival, Officer Scherle contacted a commercial service known as LanguageLine that offers on demand interpreters over the phone.[2] His goal was to get a Tigrinya interpreter for the implied consent advisory. While he was on hold, Officer Scherle entered data from Baraki's Iowa driver's license into the computer. Baraki told Officer Scherle (in English) that his friend was coming, and Officer Scherle responded, "Unfortunately, you had too much to drink." Baraki also initiated other conversation in English.

After being placed on hold for several minutes, Officer Scherle was informed that no interpreter for Tigrinya was available, and the service did not know when one would become available.

Officer Scherle consulted with other officers. As he put it, "This was a unique circumstance that I was never aware of or [had] never been a part of . . . ." Ultimately, because the chemical test must be offered within two hours, *see id.* § 321J.6(2), Officer Scherle went ahead and read aloud to Baraki the implied consent advisory in English. Officer Scherle handed Baraki his cell phone and told him he could call anyone he wanted to determine whether to take the test. Baraki kept the cell phone for less than two minutes. He tried to make a couple of calls but did not speak to anyone.[3]

Officer Scherle then made it clear to Baraki in short sentences in English that he was asking him yes or no whether he wanted to take the chemical breath

---

[2]LanguageLine is one of two telephone interpreter services used by the Iowa Judicial Branch.

[3]As noted, there had been a passenger in Baraki's vehicle and Baraki had twice before told Officer Scherle that he had a "friend coming" who could get him.

test. At this time, Officer Scherle attempted to use an online translator. He was unable to find an online translation for Tigrinya. Therefore, Officer Scherle again asked Baraki yes or no whether he wanted to take the test. Baraki confirmed that he would take the test.[4] Officer Scherle did not believe that Baraki understood the entire advisory, but he believed that Baraki consented to take the test.

Just before 1 a.m., Baraki provided a breath sample on the DataMaster. The results indicated a blood alcohol content of 0.114, which is above the legal limit of 0.08. *See id.* § 321J.2(1)(*b*).

On May 20, Baraki was charged by trial information in the Woodbury County District Court with OWI second offense, an aggravated misdemeanor, in violation of Iowa Code § 321J.2(2)(*b*). Baraki waived his speedy trial rights. On June 8, Baraki filed a motion to suppress the evidence of his blood alcohol content from the DataMaster test, arguing that he did not understand the advisory and therefore could not give consent. On July 16, the district court sustained the motion, stating:

> It is the State's burden to establish by a preponderance of the evidence that a warrantless search falls within an exception to the warrant requirement.
>
> The State has failed its burden. The Defendant did not understand the Implied Consent Advisory and thus could not give valid consent. Valid consent can only be given if it is done so knowingly and in this instance it was not. Office[r] Scherle did nothing wrong. He had no other options. The court sustains the motion and the results of the Datamaster are hereby suppressed

---

[4]The record indicates that Baraki had a prior 2020 conviction for OWI.

and the State is prohibited from using the same as evidence at any
upcoming trial herein.

(Citation omitted.) The State filed an application for discretionary review. We
granted that application.

### III. Standard of Review.

When evaluating whether a submission to chemical testing was voluntary,
we review the totality of the circumstances. *State v. Overbay*, 810 N.W.2d 871,
875 (Iowa 2012) (citing *State v. Garcia*, 756 N.W.2d 216, 219 (Iowa 2008)). Our
review of the circumstances is de novo. *Id.* Thus, "we make an independent
evaluation based on the entire record." *Id.* (citing *State v. Ochoa*, 792 N.W.2d
260, 264 (Iowa 2010)). "We give considerable weight to the district court's
assessment of voluntariness but are not bound by its factual findings." *Id.*
Regarding any statutory interpretation, we review for correction of errors at law.
*State v. McGee*, 959 N.W.2d 432, 436 (Iowa 2021).

### IV. Analysis.

**A. The *Garcia* Test and the Reasonableness Standard.** Iowa, like other
states, has an implied consent law. *See* Iowa Code § 321J.6. It provides that a
person who operates a motor vehicle in such a manner to "give reasonable
grounds" to believe that the person is intoxicated "is deemed to have given
consent to the withdrawal of specimens of the person's blood, breath, or urine."
*Id.* § 321J.6(1).

The implied consent law nonetheless gives the potentially intoxicated
driver a choice. In lieu of taking the chemical test, the driver may refuse a breath
test, and thereby suffer the revocation of their driver's license for a period of time

and the admission into evidence of their refusal. *See id.* §§ 321J.9(1), .16. "[T]he choice can be a difficult one because consenting to the breath test may reveal a blood alcohol level above the legal limit (.08 percent), making a criminal conviction more likely, while refusing the test carries administrative (revocation of driver's license) and evidentiary consequences." *State v. Kilby*, 961 N.W.2d 374, 377 (Iowa 2021). The choice is not *constitutionally* required for a breath test, which can be upheld anyway as a search incident to arrest. *Id.* at 383 ("Kilby has no constitutional right to refuse a breath test as a search incident to her arrest."). But it is statutorily required. *See Overbay*, 810 N.W.2d at 876 ("Although drivers are deemed to have impliedly consented to testing, they nonetheless generally have the statutory right to withdraw that consent and refuse to take any test."). "Upon a failure to comply with the set standards of our implied consent law the evidence becomes inadmissible." *State v. Jensen*, 216 N.W.2d 369, 374 (Iowa 1974); *see* Iowa Code § 321J.8.

Iowa law provides that the motorist "shall be advised by a peace officer" of the consequences on their driver's license of both (1) refusing to submit to testing and (2) testing above the legal limit. Iowa Code § 321J.8(1). Previously, in *State v. Garcia*, we interpreted Iowa Code section 321J.8 and addressed the issue of implied consent as it applies to non-English speakers. 756 N.W.2d 216. We noted that "[o]ther jurisdictions have taken differing approaches to resolving this issue." *Id.* at 221. Some states require "only the warning be given, not that the driver understand the consequences of refusal." *Id.* Some states "have determined that the driver need only understand that he or she has been asked

to take a test. There is no requirement that the driver understand the consequences of refusal or be able to make a reasoned judgment." *Id.*

We adopted neither of these approaches, but instead adopted an approach urged on us by the defendant—Wisconsin's reasonableness standard. *Id.* at 221–22. This standard requires the officer "under the circumstances facing him or her at the time of the arrest, to utilize those methods which are reasonable, and would reasonably convey the implied consent warnings." *Id.* at 221 (quoting *State v. Piddington*, 623 N.W.2d 528, 534–35 (Wis. 2001)).

*Garcia* involved a Spanish speaker who told the officer he did not understand English, but demonstrated an ability to answer the officer's spoken questions in English. *Id.* at 218–19. The officer did not attempt to communicate the implied consent advisory in Spanish. *Id.* at 219. After the officer read the implied consent advisory aloud and asked the defendant if he understood, the defendant said he would do what the officer wanted, "no problem." *Id.* The district court overruled the defendant's motion to suppress, concluding that the defendant "has some understanding of English." *Id.*

We affirmed the denial of the motion to suppress, reasoning as follows: "Applying the 'reasonable efforts' standard to the facts and circumstances of this case, we hold that Officer Strunk, under the circumstances facing her at the time of the arrest, utilized reasonable methods to reasonably convey the implied consent warnings to Garcia." *Id.* at 223.

**B. Applying the *Garcia* Reasonableness Standard to This Case.** On our de novo review of the record, we find that Baraki, like the defendant in *Garcia*,

had some understanding of English. He answered many of Officer Scherle's spoken questions briefly in English. We have no doubt that Baraki understood he had been arrested for OWI and was being asked to agree to provide a breath sample to measure his level of intoxication. We believe he understood he had a choice whether or not to provide the sample, and agreed to do so. We do not believe he understood the entire implied consent advisory, which includes an explanation of the specific consequences of refusing the test as compared to the consequences of taking it and failing it.

We also agree with the district court's finding that "Office[r] Scherle did nothing wrong. He had no other options." Officer Scherle tried to get a Tigrinya interpreter. He tried to see if he could use Google's translation service on the implied consent advisory. He gave Baraki his cell phone and told him he could call "anyone"—i.e., not just the persons listed in Iowa Code section 804.20.[5]

So, we need to decide what happens when an officer does everything they can to communicate the implied consent advisory in a manner that the motorist

---

[5]Iowa Code section 804.20 provides,

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney. If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained. If such person is intoxicated, or a person under eighteen years of age, the call may be made by the person having custody. An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay. A violation of this section shall constitute a simple misdemeanor.

*See, e.g.*, *State v. Tubbs*, 690 N.W.2d 911, 914 (Iowa 2005) ("[T]he statute is satisfied by giving [the arrestee] the opportunity to call or consult with a family member or an attorney.").

will understand, but due to a language barrier that could not be overcome the motorist presumably did not understand the complete advisory.

Baraki argues that at the end of the day, if the officer despite all efforts cannot deliver the implied consent advisory to a non-English speaker in a manner that they would comprehend for the most part, no testing is permissible. Thus, the non-English speaker would suffer neither the consequences of refusing to take the test nor the consequences of taking the test and failing it. Baraki focuses on the language "reasonably convey" as used in *Garcia* and argues that ultimately reading something in English to someone who does not understand the language well is not a reasonable conveyance of information. Baraki directs us to our prior statement in *Garcia* that "the purpose of Iowa Code section 321J.8 within the statutory scheme is to advise accused drivers of the consequences of submitting to or failing the chemical test." 756 N.W.2d at 222. Advising of the consequences, in Baraki's view, requires that the information be conveyed to the motorist in a manner the motorist can truly understand.

We decline to adopt this position for several reasons. First, other verbiage in *Garcia* specifically rejects Baraki's position. *Id.* Elsewhere, *Garcia* makes it clear that a non-English speaker should not receive an exemption from chemical testing or the consequences of refusing to submit to chemical testing that no English speaker would receive, just because an interpreter is unavailable. *Id.* In *Garcia,* we quoted *Piddington* as follows, "That a law enforcement officer must use reasonable methods to convey the implied consent warnings does not mean the officer must take extraordinary, or even impracticable measures to convey

the implied consent warnings." *Id.* (quoting *Piddington*, 623 N.W.2d at 542). Quoting another case, we added, "Although making an interpreter available when possible is desirable, finding an interpreter is not absolutely necessary and should not 'interfere with the evidence-gathering purposes of the implied consent statute.' " *Id.* at 222 (quoting *Yokoyama v. Comm'r of Pub. Safety*, 356 N.W.2d 830, 831 (Minn. Ct. App. 1984)).

Second, a requirement that the implied consent advisory be "reasonably conveyed" to the motorist in the sense that Baraki uses the term would come close to a subjective test. It would make the validity of the advisory turn on what this motorist likely would have understood. Baraki's logic might require law enforcement to make adjustments to the motorist's cognitive limitations, or to take special measures when reading the implied consent advisory to motorists who appear to be especially intoxicated, in order to "reasonably convey" to them the gist of the advisory. This goes against the overall thrust of *Garcia*, which is only to require the officer to take reasonable steps. As we said a few years later in *State v. Lukins*, summarizing the holding of *Garcia*, "A peace officer need only use reasonable methods, under the circumstances, to convey to a drunk-driving suspect the implied consent warnings." 846 N.W.2d 902, 908 (Iowa 2014) (citing *Garcia*, 756 N.W.2d at 222).[6]

---

[6]We think the district court applied a version of a subjective test here. As noted, it concluded that the motion to suppress should be granted because "[t]he Defendant did not understand the Implied Consent Advisory." *Garcia* does not support such an approach based on the defendant's subjective understanding. Indeed, the district court did not mention *Garcia* at all in its ruling.

Third, while we find it unlikely that Baraki understood the relative legal consequences of taking and refusing the chemical test, the legislature has acknowledged the existence of that issue for *all* motorists and has addressed that issue by giving *all* motorists a limited right to consult with counsel before deciding whether to take the test. *See* Iowa Code § 804.20; *State v. Senn*, 882 N.W.2d 1, 7 (Iowa 2016) ("[W]e read section 804.20 together with the implied-consent provisions of Iowa Code chapter 321J."). Officer Scherle provided Baraki with a more generous consultation right than section 804.20 actually affords. After reading the implied consent advisory, Officer Scherle handed Baraki his cell phone and told him he could call "anyone"—including presumably someone to help him translate the implied consent advisory. Baraki tried for less than two minutes.

There is also a concern that Baraki's approach would result in two disparate legal regimes. Apparently, intoxicated motorists whose English is limited and for whom no interpreter is available would *not* have to undergo breath testing at the peril of losing their driving privileges. This would put this category of motorists in a better legal position than all other motorists. We doubt the legislature intended this result when it adopted the terminology, "shall be advised," which is the focus of our interpretive efforts here and in *Garcia. See* Iowa Code § 4.6 (discussing rules for interpreting ambiguous statutory language).

Additionally, it bears emphasis that the implied consent procedure is not constitutionally required in the circumstances present here, *see Kilby,* 961

N.W.2d at 382–83; the question is simply one of statutory interpretation. Baraki clearly understood that he had a choice to test or not to test, and clearly chose to test, even though he likely did not appreciate all the legal ramifications of each option. Lastly, as one court observed,

> [R]equiring that officers advise drivers of the implied consent rights in their native language would impose severe administrative costs in that officers would have to be equipped to issue warnings in any and every language spoken by drivers in this State or would have to have access to an interpreter to issue the warnings. The logistics of such a requirement would be extremely problematic in a society as pluralistic and diverse as the United States.

*Rodriguez v. State*, 565 S.E.2d 458, 462 (Ga. 2002). Although access to interpreter services is undoubtedly better now than in 2002, it is not perfect.

In sum, we read *Garcia* as adopting a general reasonable-efforts standard: when a motorist has demonstrated limited English proficiency, law enforcement must make reasonable efforts to have the implied consent advisory interpreted into a language in which the motorist is fluent. We do not adopt Baraki's selective reading of *Garcia* that oversimplifies the opinion. Thus, we conclude that Officer Scherle complied with Iowa Code section 321J.8 by making reasonable efforts and using reasonable methods under the circumstances to convey to Baraki the implied consent advisory.

**V. Conclusion.**

For the reasons stated, we reverse the ruling of the district court granting Baraki's motion to suppress and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**